1
2
3
4
5
6         IN THE UNITED STATES DISTRICT COURT
7
8         FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10  UNITED STATES OF AMERICA,
11         Plaintiff,                                    No. CR 17-00430 WHA
12     v.
13  DAVID ESCOBAR,                                       **ORDER GRANTING MOTION TO SUPPRESS FRUITS OF UNLAWFUL SEARCH AND SEIZURE**
14         Defendant.
15                                        /
16
17                        **INTRODUCTION**
18     In this drug prosecution, defendant moves to suppress the fruits of a warrantless search of his hotel room. For the reasons stated below, defendant's motion is **GRANTED**, and the evidence flowing from the unlawful search must be suppressed.
19
20
21                     **FINDINGS OF FACT**
22     On July 30, 2017, DEA Task Force Officer and San Bruno Police Department Detective James Haggarty arrived at a Super 8 Motel in San Bruno following a tip that defendant David Escobar was at the hotel selling narcotics. SBPD Corporal Jose Valiente and DEA Special Agents Brandon Cahill and Matthew Monschein joined to assist. The officers went to Escobar's hotel room around 9:30 p.m. Each wore clothing identifying himself as a police officer without firearms or handcuffs drawn. No police canines assisted until later that evening (Tr. 10:17–13:17; 54:19–56:8; 88:4–89:2; 112:18–115:25).
23
24
25
26
27
28

Detective Haggarty knocked on the door to Escobar's room. Escobar opened the door, stepping partially out into the hallway and letting the spring-loaded door close against him. Detective Haggarty introduced himself, then asked Escobar if they could speak to him about crime in the area. Escobar was wearing underpants when he came out into the hallway. Detective Haggarty suggested that they continue speaking inside of the hotel room.

Escobar responded, "yeah, I guess," and took a step back into the room.

Escobar did not motion the officers into the room but instead stood inside the entryway to the room as if ready to continue the conversation. In stepping back, however, Escobar pushed open the door to allow sufficient space for Detective Haggarty to walk around Escobar and enter the room. Escobar and Corporal Valiente immediately followed. Special Agents Cahill and Monschein entered last. At this point, Escobar did not voice any objection to the officers entering the room (Tr. 13:18–16:14; 33:20–35:15; 56:1–58:18; 72:3–73:19).[1]

Immediately inside the room was a vestibule. The right side of the vestibule included a sink, microwave, and refrigerator, and the left side of the vestibule included a door to the bathroom. The main bedroom area lay just beyond the vestibule. On its far right stood a desk and television. Around the left corner of the vestibule stood a chair, a small nightstand, and a bed. A black bag with the word "Postmates" written in white sat on the floor next to the chair. As the officers would discover, the Postmates bag contained several pounds of methamphetamine (Gov. Exh. 1, 2; Def. Exh. F, G).

---

[1] The Court has tried hard to reconcile the conflicting testimony regarding the movements of the four officers and Escobar. The testimony is nearly consistent that Detective Haggarty made the first significant movement, namely from the hallway towards the television, passing immediately by Escobar. The testimony is also nearly consistent that Special Agents Cahill and Monschein entered the room last. The witnesses remain in hopeless conflict, however, over whether Corporal Valiente followed Detective Haggarty into the bedroom area (followed by Escobar) versus whether Escobar followed Detective Haggarty into the bedroom area (followed by Corporal Valiente). This order finds that Detective Haggarty was the first to enter the room and that Special Agents Cahill and Monschein were last. The Court has considered the conflicting testimony, but finds it unnecessary to determine the remaining steps in the sequence.

2



**Diagram of Suite**
**(not to scale)**

When Detective Haggarty walked past Escobar, he did not pause within the vestibule. Instead, he proceeded into the bedroom area, conducted a protective sweep, and came to rest near the television. Escobar eventually followed Haggarty. They proceeded to talk.

Corporal Valiente also walked completely through the vestibule, turned left, and continued towards the Postmates bag. After conducting their own protective sweep of the bathroom, Special Agents Cahill and Monschein remained in the vestibule (Tr. 16:6–14; 39:11–40:2; 72:12–22; 92:6–23).

The methamphetamine inside the Postmates bag was not visible from the vestibule or from the side of the room where Detective Haggarty and Escobar spoke. Rather, it could only be seen by standing directly over the Postmates bag and looking down through a softball-sized opening at one end of the zipped top. Once Corporal Valiente so positioned himself, he saw what he believed to be methamphetamine. After shining his flashlight through the opening into

the bag to confirm its contents, Corporal Valiente placed Escobar in handcuffs. At this point Escobar asked whether the officers had a warrant (Tr. 62:6–66:12; 74:3–75:1; 124:12–16).

In August 2017, Escobar was indicted for possession with intent to distribute methamphetamine. Escobar filed the instant motion to suppress in October 2017, and two evidentiary hearings on the motion were held on January 10 and January 16, 2018, respectively. The parties submitted supplemental briefing, which this order follows (Dkt. Nos. 1, 18, 36–38).

**ANALYSIS**

The Fourth Amendment's prohibition on unreasonable searches and seizures protects the legitimate expectation of privacy of an occupant of a hotel or motel room. *Bailey v. Newland*, 263 F.3d 1022, 1029 (9th Cir. 2001).

**1. ESCOBAR WAS NOT SEIZED IN THE DOORWAY OF HIS HOTEL ROOM.**

Escobar first argues that his contact with the officers in the threshold of his hotel room amounted to a unlawful seizure for purposes of the Fourth Amendment. Generally, the so-called "knock and talk" exception to the warrant requirement permits law enforcement officers to "encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Lundin*, 817 F.3d 1151, 1158 (9th Cir. 2016). Our court of appeals has explained that:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant there of whether the questioner be a pollster, a salesman, or an officer of the law.

*United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964). The established standard for determining when such an encounter becomes a seizure "is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Orhorhaghe v. I.N.S.*, 38 F.3d 488, 494 (9th Cir. 1994) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

4

Our court of appeals has had multiple opportunities to assess whether a "knock and talk" amounted to a seizure rather than a voluntary encounter. In *United States v. Crapser*, for example, police did not seize the defendant where four officers politely knocked on the defendant's motel room door in the middle of the day, did not draw attention to their weapons or use any form of physical force, made no effort to enter the motel room, and did not suggest that the defendant could not leave or return to his room. 472 F.3d 1141, 1146–47 (9th Cir. 2007). Similarly, in *Cormier,* a "knock and talk" encounter was consensual, despite occurring in the evening, where the officer knocked on the door for only a short period, never announced that she was a police officer, did not unreasonably persist in her attempt to obtain access to the room, and the defendant never attempted to terminate the encounter. 220 F.3d at 1109.

In contrast, our court of appeals found that an interaction between officers and a suspect outside of the suspect's apartment amounted to a seizure where he faced "the threatening presence" of four officers, one officer purposefully revealed his concealed weapon, the confrontation took place in a hallway shielded from public view, and the officers acted "in an officious and authoritative manner that indicated that [the suspect] was not free to decline" the officers' requests. *Orhorhaghe,* 38 F.3d at 494–96.

This order finds the instant case dissimilar to *Orhorhaghe.* The facts presented instead compare to those in *Cormier* and *Crapser*. Here, although the interaction occurred at night and Escobar was never told he was free to leave, Detective Haggarty said nothing upon knocking on the door and the officers never drew weapons or handcuffs. Moreover, Escobar did not try to end the encounter in the hallway, and at no point did the officers indicate that he was unable to return to his room or otherwise end the conversation. Under the totality of the circumstances, Escobar was not seized within the meaning of the Fourth Amendment when he opened his door and began speaking with the officers in the threshold of his hotel room.

**2. ESCOBAR CONSENTED, AT MOST, TO THE OFFICERS' LIMITED ENTRY INTO THE ROOM'S VESTIBULE.**

There is no dispute that the officers entered Escobar's hotel room without a warrant. Consent, however, is a well-established exception to the Fourth Amendment's prohibition on

warrantless searches. *Morgan v. United States*, 323 F.3d 776, 781 (9th Cir. 2003). Consent can be express or implied, but it must be "unequivocal and specific." *United States v. Basher*, 629 F.3d 1161, 1167–68 (9th Cir. 2011). The standard for measuring the scope of consent under the Fourth Amendment is that of "'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). In a non-binding decision, our court of appeals indicated that this objectively reasonable standard includes an analysis of whether the suspect "reasonably understood [his] consent to extend to the search conducted." *United States v. Yerger*, 12 F.3d 1110, at *3 (9th Cir. 1993). The government must prove that consent was effectively given. *United States v. Shaibu*, 920 F.2d 1423, 1428 (9th Cir. 1990).

This order finds that Escobar consented, at most, to moving the conversation from the hallway to the vestibule, not from the hallway into the bedroom area. In the "absence of a specific request by police for permission to enter a home, a defendant's failure to object to such entry is not sufficient to establish free and voluntary consent." *Id.* at 1428. Here, concededly, Escobar not only took a step back and caused the door to open further, but he also verbally indicated his willingness to continue speaking with the officers. Under these circumstances, the officers could reasonably believe that they could enter insofar as reasonable necessary to continue the conversation. But even viewing the evidence in the light most favorable to the government, it has failed to prove that Escobar consented to a search of his room or to the officers' presence beyond the vestibule area. Because Haggarty's suggestion to speak inside the room was tied to his remark that Escobar wore nothing but underwear, this order finds that a reasonable person would understand their exchange to mean that Escobar consented only to continue their conversation where passersby could not readily see him.

Our court of appeals has made clear that an invitation to enter a dwelling does not, without more, give the officers permission to enter every room in that dwelling. *United States v. Mejia*, 953 F.2d 461, 466 (9th Cir. 1991). In *Mejia*, the defendant's wife let police inside their home and, after the officers asked her to wake up her husband, did not protest when officers followed her into their bedroom. *Id.* at 463. The appellate court held that by allowing

6

police to follow her from one room to another without objection, the defendant's wife gave subsequent implied consent to their presence beyond their initial entry. Because "a reasonable person who objected to the officers' following her would have said so," it was reasonable for the officers to interpret the wife's behavior "to mean that she was leading them to her husband in response to their request." *Id.* at 466.

Here, the government has failed to show that Escobar gave any subsequent implied consent to the officers venturing throughout the entirety of his hotel room. "When seeking actual consent to enter someone's home, officers must generally make a 'specific request' to enter, and even then, they are permitted to stray only where any other visitor might be expected to go." *United States v. Smith*, 252 F. Supp. 3d 1033, 1037 (D. Nev. 2017) (Judge Andrew Gordon). Importantly, Escobar only consented to the officers' entry in response to Detective Haggarty's remark that Escobar was in the hallway in his underwear. When Escobar stepped backwards into the room, he continued to face the officers. He did not turn and lead the officers into the room. Nor did he otherwise indicate that the officers should proceed past him. There was sufficient room in the vestibule for the conversation to proceed. It was unreasonable in these circumstances to treat Escobar's consent as permission to conduct a protective sweep or otherwise enter his entire room (and bathroom).

Contrary to the government, *United States v. Basher*, 629 F.3d 1161 (9th Cir. 2011), cuts against a finding that Escobar consented to the officers' presence beyond the room's vestibule. There, in response to an officer's request that the defendant's son retrieve a weapon from the defendant's tent, the defendant "nodded affirmatively." Our court of appeals agreed that the defendant voluntarily consented to the retrieval of the gun, concluding that "the head nod did not seem to be ambiguous . . . [t]he consent in this case seems to be specific — clearly defining who would enter the tent (his son) and the scope of the activity (bringing the gun outside)." *Id.* at 1168–69. *Basher* accordingly confirms that in determining the reasonable scope of a defendant's consent, courts should look to the interaction leading up to the consent, rather than looking solely to any explicit limitations placed on the consent by a defendant.

*United States v. Junne Kyoo Koh*, 704 Fed. Appx. 639 (9th Cir. 2017), does not indicate otherwise. There, our court of appeals affirmed the district court's determination that the defendant consented to the police's presence in his dining room *and* hallway where the defendant "called the police and invited them into his home, did not object when the officer followed him a short distance to the hallway, and later consented to a search of the home." *Id.* at 640. The facts here are in stark contrast. Escobar did not call the police and invite them into his room. Rather, the officers approached Escobar's room at 9:30 p.m. to conduct a "knock and talk." Nor did Escobar lead or motion the officers into the bedroom area. Detective Haggarty and Corporal Valiente instead proceeded past where Escobar stood of their own accord. It is true that once they were there, Escobar did not immediately object. But this was the fait accompli. Events moved so fast that one could not have reasonable expected Escobar to bark out an objection in the face of four armed officers.

The government argues that Escobar's consent did not reasonably confine the officers to the vestibule because the vestibule was small and not well lit. In particular, the government argues that Detective Haggarty reasonably went to the best lit area in the room (near the television) in order to continue speaking with Escobar. The vestibule did, however, have a light that could be turned on (Def. Exh. G). Moreover, *Corporal Valiente* located himself on the other side of the room near the Postmates bag, a location which the government does not contend was well lit.

Accordingly, under the totality of the circumstances, this order finds that the officers exceeded the scope of Escobar's consent when they filled the entire suite.

**3. NEITHER THE PLAIN VIEW DOCTRINE NOR THE PROTECTIVE SWEEP DOCTRINE JUSTIFIES THE SEIZURE.**

Two additional exceptions to the warrant requirement are the plain view doctrine and the protective sweep doctrine. Neither exception justifies the seizure at issue here. *First*, under the "plain view" doctrine, police may seize evidence even where an officer is not searching for it, "but nonetheless inadvertently comes across an incriminating object." *Horton v. California*, 496 U.S. 128, 135 (1990) (citation omitted). Officers must not, however, "violate the Fourth

8

Amendment in arriving at the place from which the evidence could be plainly viewed." *Id*. at 136. In this case, Corporal Valiente violated Escobar's Fourth Amendment rights by proceeding past the vestibule and continuing to the corner of the room where the Postmates bag was located. Moreover, the methamphetamine was only viewable when standing directly over the bag, and could not be seen from the vestibule or the side of the room where Detective Haggarty and Escobar spoke. Accordingly, the plain view doctrine cannot serve as a justification for the warrantless intrusion here.

*Second,* although Detective Haggarty and Special Agent Cahill conducted "protective sweeps" upon entering the hotel room, the government does not contend that these sweeps resulted in the discovery of the methamphetamine. Rather, as the government admits, the methamphetamine was only discovered when Corporal Valiente — who did not do a protective sweep — approached and looked into the Postmates bag. As a result, the protective sweep doctrine also does not justify the warrantless intrusion at issue here.

The Court notes its concern, however, with the conduct in this case. Here, it appears that the police timed their "knock and talk" at Escobar's hotel room for the late evening, an unsurprising time to find an occupant not fully dressed. When Escobar in fact answered in his underwear, they used this circumstance to suggest continuing the talk out of the public hallway. When Escobar gave the slightest indication of consent, they used it as an invitation to search the entire suite.

To be sure, the protective sweep doctrine has been upheld by the Supreme Court and by our court of appeals. *See, e.g., Maryland v. Buie*, 494 U.S. 325, 327 (1990); *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993). In *Buie*, the Supreme Court explained that "a 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Buie* requires that a protective sweep be based on "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

And while our court of appeals has applied the protective sweep doctrine to a dwelling that officers entered by consent, nothing in *Garcia* excuses the government from the requirement that a protective sweep be based on "articulable facts" that would lead a reasonable officer to believe a sweep was necessary to protect the officer's safety. 997 F.2d at 1282. In other words, the protective sweep doctrine does not give officers carte blanche to search any room or dwelling in which they are present.

## CONCLUSION

For the reasons stated above, Escobar's motion to suppress the evidence seized as a result of the warrantless search of his hotel room is **GRANTED,** and the evidence will be excluded from his trial. A status hearing on this matter is scheduled for **MARCH 6 AT 2:00 P.M.**

**IT IS SO ORDERED.**

Dated: February 16, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

10